

# NUMBER 13-19-00127-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

UNITED SPECIALTY INSURANCE
COMPANY,                                                                    Appellant,

v.

FARMERS INSURANCE EXCHANGE,                                   Appellee.

On appeal from the 206th District Court
of Hidalgo County, Texas.



# NUMBER 13-19-00128-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

UNITED SPECIALTY INSURANCE
COMPANY,                                                            Appellant,

v.

WASP CONSTRUCTION, LLC,                                      Appellee.

## On appeal from the 206th District Court
## of Hidalgo County, Texas.

# MEMORANDUM OPINION

### Before Justices Benavides, Longoria, and Perkes
### Memorandum Opinion by Justice Perkes

This is a consolidated appeal from cross-motions for summary judgment on defense and indemnity and cross-motions for summary judgment on breach of contract involving an insurance dispute. Appellant United Specialty Insurance Company (USIC), as the assignee and subrogee of Alonzo Cantu Construction, Inc. (Cantu), argues the trial

court erred in granting appellees' Farmers Insurance Exchange (FIE) and Wasp Construction, LLC (Wasp) motions of summary judgment because (1) Cantu is an additional insured under the FIE policy, and thus, FIE had a duty to defend and indemnify Cantu in the underlying suit; and (2) Wasp breached its subcontract with Cantu in its failure to defend or indemnify Cantu for claims asserted against Cantu in the underlying suit. We affirm.

## I.    BACKGROUND

On August 26, 2014, Cantu, a general contractor, accepted a written subcontracting bid from Wasp to perform a water and sewer improvement project. Wasp held a "business owners policy" under FIE and was covered through a workers compensation policy under Service Lloyds Insurance Company. Cantu carried a liability insurance policy under USIC. Wasp's FIE policy included an "additional insured" provision, which allowed for the extension of limited additional insured coverage stating "[a]ny person or organization for whom you are performing operations is also an insured, if you and such person or organization have agreed in writing in a contract or agreement that such person or organization be included as an additional insured on your policy." At the time Wasp began working on the excavation project, however, Cantu was not a named additional insured under Wasp's FIE policy.

On August 30, 2014, Hector Guadalupe Mata Martinez, a Wasp employee, was installing underground pipes when he was crushed by collapsing dirt. The collapse resulted in severe injuries, rendering Martinez a paraplegic. On September 9, 2014, Martinez and associated plaintiffs, filed a petition against Wasp in trial cause number C-7318-14-H. The petition was later amended to include Cantu as a defendant.

3

On October 9, 2014, Wasp signed a subcontracting agreement with Cantu, which itself stipulates it was "made this 12th day of September, 2014"—two weeks after the accident. The parties, however, dispute the date the subcontracting agreement took effect. USIC argues the agreement "mistakenly reflected" an incorrect "made" date, and in any matter, the contents of the subcontract were agreed to orally on August 26, 2014. The subcontract included indemnification and insurance provisions, compelling Wasp to add Cantu as an additional insured under its FIE policy and defend and indemnify Cantu against any liability for bodily injuries occurring on its worksite.[1]

---

[1] Neither party challenges the meaning of the indemnification and insurance provision in the Wasp-Cantu contact, which states in applicable part:

> To the fullest extent permitted by law, subcontractor shall fully protect, indemnify, and save and hold harmless the owner of premises and contractor from and against any and all claims, demands, damages, liens, liabilities, defects in subcontractor's work, damage to the work of the subcontractor, damage to other property, personal injury to subcontractor's employees or third parties, and/or causes of action of any nature whatsoever, including attorney[']s fees, losses and expenses, arising in any manner, directly or indirectly, out of or in connection with the work or operations of subcontractor, anyone directly or indirectly employed or retained by subcontractor or the use of any products material or equipment furnished by subcontractor. . .

> Prior to starting Work, the Subcontractor shall obtain, maintain[,] and pay for Workmen's Compensation insurance for all of Subcontractor's employees. Subcontractor shall also obtain, maintain[,] and pay for comprehensive general liability insurance and comprehensive automobile liability insurance protecting the Subcontractor and Contractor against claims for bodily injury or death, damage to property and products completed operations liability in connection with the Work or occurring upon, or about the Premises, with limits at least equal to or greater than those specified below:

> Limits of Liability:
> $2,000,000.00 General Aggregate
> $2,000,000.00 Products-Comp/Ops Aggregate
> $1,000,000.00 Personal and Advertising injury
> $1,000,000.00 each occurrence or accident

> . . . .

> Subcontractor also agrees that its comprehensive general liability insurance policies shall name and covers Contractor as an additional insured in connection with the Premises and Subcontractor's Work for both ongoing and completed operations. Contractor's additional insured status is not intended to be in any way tied to or limited by the Subcontractors obligations described under [the indemnification paragraph] of this Subcontractor Agreement. The comprehensive general liability insurance obtained by Subcontractor will

On April 24, 2017, while the aforementioned underlying case was pending, USIC filed a petition for declaratory judgment against FIE, Cantu, and Wasp in the cause now before this Court, trial cause number C-1928-17-D. USIC, in part, claimed FIE was responsible for defending Cantu as an additional insured under Wasp's insurance, as stipulated in the subcontract agreement.

Two months later, on June 19, 2017, Cantu filed a cross-claim against Wasp in cause number C-7318-14-H, claiming contractual indemnity, breach of contract, and contribution for Wasp's "wrongful failure to defend and indemnify Cantu for the claims asserted against Cantu in the Underlying suit and for its failure to provide additional insured coverage under the [FIE] policy to Cantu."

On September 14, 2017, after an initial *Stowers* demand letter went unanswered, *see G.A. Stowers Furniture Co. v. Am. Indem. Co.*, 15 S.W.2d 544, 546 (Tex. Comm'n App. 1929), counsel for Martinez sent Cantu and Wasp a subsequent demand letter in a "final attempt to settle . . . for policy limits."[2] USIC's counsel sent a letter to FIE's counsel dated September 21, 2017, acknowledging that Cantu and Wasp were in receipt of the *Stowers* demand letter and proposing a settlement solution.[3]

---

be specifically endorsed to provide that Contractor's coverage thereunder as an additional insured is primary to and non-contributory with any and all other insurance or self-insurance maintained by Contractor, irregardless of the "other insurance" provisions or related terms of such insurance or self-insurance.

[2] Cantu had a primary and an excess policy with USIC, plaintiff in this case, totaling $3,000,000 in coverage. Wasp had a $1,000,000 liability policy with FIE.

[3] USIC wrote, in part:

It is our intention, on behalf of USIC's primary policy, to accept and tender $1 million to plaintiffs by Friday's noon deadline. . . . Given this position, it is our client's intent to make known that USIC is willing to dismiss with prejudice to refiling the declaratory judgment action in the event that [FIE] is willing to pay its full $1 million limit toward resolution of the tort case on behalf of [Cantu], and the breach of contract action and cross[-]claim filed by [Cantu] against [Wasp] will be dismissed with prejudice to refiling as well.

On September 22, 2017, FIE, through its attorney, offered to "contribute its liability limits of one million dollars towards the settlement of all claims against Wasp and Cantu," conditioned on certain terms with respect to resolving the insurers' dispute:

> (a) USIC's agreement to resolve the coverage issues through litigation and to pay FIE one million dollars should the court determine that FIE has no coverage for the claims against Cantu and Wasp. If USIC prevails, then it pays nothing . . . (b) the dismissal of Cantu and Wasp from all litigation, even if it means that USIC has to pay out of its excess policy to effectuate this.

USIC responded, accepting FIE's terms, save one condition:

> In response to your letter of earlier today, USIC is in agreement that it is in best interests of both [FIE] and USIC to provide [the mediator] with $2 million for use to settle the claim on behalf of both Cantu and Wasp. USIC agrees that the insurers can continue their dispute regarding payment of Farmer's $1 million and the triggering of [FIE]'s policy and ordering of coverage in the context of a declaratory judgment suit. . . . USIC will agree that neither Cantu nor Wasp need to participate in the declaratory judgment action if they are successfully settled out of their exposure in the underlying tort matter.
>
> USIC does not understand the other conditions set forth in your letter as they appear to expand the scope of coverage that is owed by USIC's policies; therefore, USIC does not agree to them.

FIE's counsel replied as follows:

> To confirm our call, the part you objected to was the last phrase of condition (b) which is that if the case cannot settle for 2 mill then USIC has to pay out of its excess, and we still get back our million if we win on coverage. This will only apply if the case does not settle at 2. You advise that for now you do not plan on offering any more than 2 mill so that contingency is not extant.
>
> With that understanding, and our agreement that [a case] doesn't apply, we have a deal.

USIC counsel responded, confirming, "Deal done at $2M for Cantu and Wasp. Eddie inking. . . ." On the same day FIE and USIC confirmed agreement to payout a settlement in cause number C-7318-14-H on behalf of Wasp and Cantu, Cantu agreed to settle all

6

cross-claims against Wasp *and* Cantu assigned its claims against Wasp to USIC. It is unclear whether the settlement of the cross-claims or the assignment occurred first.

Also on September 22, 2017, FIE filed its traditional motion for summary judgment in the cause before this Court, arguing, for reasons explored *infra*, that "it owes Wasp and Cantu neither defense nor indemnity under the policy of insurance it issued to Wasp, for either the principal claim of Martinez, the cross-claim of Cantu against Wasp, or the intervention of Service Lloyd[4]".

Following continued communications between USIC, FIE, Wasp, and Cantu on October 30, 2017, USIC proposed a "counter proposed agreement." The proposed agreement still required that FIE pay $1 million and USIC pay $1 million to settle the claims, but it removed the following provision included in the prior agreement:

> All claims, cross claims, third party demands, counterclaims and/or interventions will be dismissed with prejudice, each party to bear their own costs. Plaintiffs, Wasp Construction, LLC, Alonzo Cantu Construction Company, Inc. forever release one another, their employees, agents, officers, directors, members, partners and shareholders of and from any liability that was asserted or could have been asserted in the underlying suit.

Then, on November 2, 2017, counsel for USIC sent out the following email to counsel for FIE, Wasp, Cantu, and Martinez:

> Like [FIE], USIC is prepared to fund its $1M toward settlement of the claims of Plaintiffs and the workers comp carrier.
>
> Unlike [FIE], USIC's agreement to fund the settlement was not contingent upon entry of the rule 11 agreements proposed by [FIE]. [FIE] has unilaterally imposed this condition for funding. In addition, [FIE]'s proposal to tie funding of the tort suit to the declaratory judgment action is not acceptable to USIC. The terms proposed by [FIE] in the "all party" agreement are agreeable to USIC, subject to the minor edits shown in the attached (Workshare compare copy also attached for convenience to show edits). USIC has signed this agreement. The terms proposed by [FIE] as to

---

[4] The workers compensation carrier, Service Lloyds Insurance Company intervened in the underlying injury case to recoup its payments.

7

the "insurer only" agreement are not acceptable to USIC, but USIC believes that the insurers' dispute should not hold up funding of the underlying settlement and allowing that matter to proceed to resolution, except for resolution of issues presented by the contractual claims between Wasp and Cantu and its cross-claim that raises that issue.

The record does not include any correspondence that followed.

On November 9, 2017, FIE filed an amended traditional motion for summary judgment to "compel specific performance of [a] settlement agreement, to dismiss various settled claims and parties, to specify the issues to be tried and relief to be awarded and for fees and costs in bringing this motion."

On January 31, 2018, USIC amended its original petition to assert claims as assignee and abrogee of Cantu against Wasp for breach of contract in cause number C-1928-17-D. "[S]tanding in the shoes of Cantu, USIC seek[s] to have the Court reform the Subcontract Agreement to reflect the true agreement between WASP and Cantu," asserted USIC. On February 1, 2018, USIC filed its "Combined Traditional Motion for Summary Judgment and Response to [FIE's] Traditional Motion for Summary Judgment." USIC principally argued Cantu is an additional insured under the FIE policy with respect to the underlying suit, and FIE had a duty to defend Cantu.

Meanwhile, on March 5, 2018, in cause number C-7318-14-H, after Martinez received his settlement and dismissed his claims against Wasp and Cantu, Wasp filed a motion to dismiss claims asserted against it by Cantu. A hearing was held on Wasp's motion on March 29. Counsel for USIC was present and presented with the court with no objection as to why Wasp's request for dismissal of claims should not be granted. The trial court thereby dismissed Cantu's claims against Wasp with prejudice.

On July 31, 2018, Wasp moved for summary judgment in C-1928-17-D, arguing USIC's claims, brought as an assignee on behalf of Cantu, are barred by res judicata, having already been dismissed with prejudice in the preceding cause number. In response, USIC filed a cross-motion for summary judgment against Wasp, arguing that the trial court in cause number C-7318-14-H "dismissed claims that no longer existed before her" because Cantu had previously assigned its claims against Wasp to USIC.

Following multiple hearings on the cross-motions for summary judgment, the trial court granted summary judgment in favor of FIE on August 25, 2018, and in favor of Wasp on February 25, 2019. This appeal followed.

## II. FIE's Summary Judgment

Asserting the trial court erred when it granted FIE's traditional motion for summary judgment and denied its motion for summary judgment, USIC argues the subcontract signed by Cantu and Wasp was a valid and enforceable contract in effect prior to the reported loss, requiring that FIE defend and indemnify Cantu as an additional insured under Wasp's policy with FIE. Specifically, USIC contends the subcontract was in effect on the date of the accident because (1) an oral agreement was in place, (2) reformation applies, and (3) the written agreement merely formalized what had already been intended by both parties.

### A. Standard of Review and Applicable Law

On appeal, we review de novo a trial court's summary judgment ruling. *See Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 84 (Tex. 2018); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).

9

When, as here, the parties file competing motions for summary judgment, each party bears the burden of establishing that it is entitled to judgment as a matter of law. *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 837 (Tex. 2018) (citing *City of Garland v. Dall. Morning News*, 22 S.W.3d 351, 356 (Tex. 2000)). We review both parties' summary judgment evidence and determine all questions presented and render the judgment that the trial court should have rendered. *Id.* "[A] defendant who conclusively negates at least one essential element of a cause of action or conclusively establishes all the elements of an affirmative defense is entitled to summary judgment." *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 79 (Tex. 2015).

We construe insurance policies using ordinary rules of contract interpretation. *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 831 (Tex. 2009). "Accordingly, we give policy language its plain, ordinary meaning unless something else in the policy shows the parties intended a different, technical meaning." *Id.*; *see Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 258 (Tex. 2017) ("Unless the policy dictates otherwise, [courts] give words and phrases their ordinary and generally accepted meaning, reading them in context and in light of the rules of grammar and common usage." (quoting *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015))). Courts must "examine the entire agreement and seek to harmonize and give effect to all provisions so that none will be meaningless." *Nassar*, 508 S.W.3d at 258.

If the parties offer differing constructions of the policy but only one is reasonable, then the policy is unambiguous, and we will adopt the reasonable interpretation. *Id.* (citing *Grain Dealers Mut. Ins. Co. v. McKee*, 943 S.W.2d 455, 459 (Tex. 1997)); *see Liberty Surplus Ins. Corp. v. Exxon Mobil Corp.*, 483 S.W.3d 96, 100–01 (Tex. App.—Houston

[14th Dist.] 2015, pet. denied). Alternatively, if we determine that both interpretations are reasonable, then the policy is ambiguous. *Nassar*, 508 S.W.3d at 258. The parties' mere disagreement about the contract's meaning does not create an ambiguity. *See In re Deepwater Horizon*, 470 S.W.3d 452, 464 (Tex. 2015). Whether a contract is ambiguous is a question of law. *Id.*

## B.    Discussion

Here, on August 26, 2014, Wasp and Cantu executed a purchase agreement which did not include any insurance or indemnification language. Martinez was injured on August 30, 2014, and he filed suit on September 9, 2014. On October 9, 2014, Wasp and Cantu signed a subcontract requiring that Wasp add Cantu as an additional insured on its FIE policy. The contract contains language indicating it was "made" on September 12, 2014.

The parties agree that Cantu was ultimately never named in the FIE policy or expressly included as an additional insured in an endorsement or certificate of insurance, and no written agreement to include Cantu as an additional insured existed prior to the accident giving rise to the claim. *See In re Deepwater Horizon*, 470 S.W.3d at 464; *see generally Transp. Intern. Pool, Inc. v. Cont'l Ins. Co.*, 166 S.W.3d 781, 786 (Tex. App.—Fort Worth 2005, no pet.) (explaining "[a]n additional insured is a party protected under a policy without being named in the policy"). USIC, however, argues that (1) Wasp and Cantu had an oral agreement entered prior to Martinez's accident, which was eventually memorialized in written form; (2) the FIE policy only required written contract, which Wasp and Cantu have; (3) thus, Cantu is an additional insured, and FIE must act accordingly.

FIE counters that its insurance policy, while providing for additional insured coverage, limits said coverage to those agreed upon in writing prior to a reported incident—i.e., "FIE policy requires that at the time of the loss that Wasp and Cantu 'have agreed [note past tense] in writing' to name Cantu." FIE contends it is, therefore, irrelevant whether there was an oral agreement in place prior to the accident, as a post-loss written agreement would effectively nullify the import of the policy's requirement that any liability coverage be in writing. We agree with FIE.

The FIE "additional insured" provision, in relevant part, provides as follows:

> Any person or organization for whom you are performing operations is also an insured, *if you and such person or organization have agreed in writing in a contract or agreement that such person or organization be included as an additional insured on your policy*. Such person or organization is an additional insured only with respect to liability arising out of your ongoing operations performed for that insured. A person's or organization's status as an insured under this paragraph ends when your operations for that insured are completed or the contractor's agreement is terminated.

(Emphasis added). The additional insured provision in this case unambiguously limits FIE's obligations to only Wasp and those entities with whom Wasp directly contracts in writing for additional coverage.[5] *See JP Energy Mktg., LLC v. Commerce & Indus. Ins. Co.*, 412 P.3d 121, 125 (Okla. Civ. App. Div. 2017) (finding similar language unambiguous); *Liberty Ins. Corp. v. Ferguson Steel Co., Inc.*, 812 N.E.2d 228, 229 (Ind. Ct. App. 2004) (same); *see also Samsung Fire & Marine Ins. Co. Ltd. v. RLI Ins. Co.*, No. 655169/2016, 2018 WL 310322, at *5 (N.Y. Sup. Ct. Jan. 3, 2018) (same); *Essex Ins. Co. v. Do It All Inv. Group, Inc.*, No. 1:11-CV-03120-JOF, 2012 WL 13009098, at *4–5 (N.D. Ga. Sept. 21, 2012) (same). FIE's interpretation, asserting that the policy implicitly

---

[5] As the parties note in their respective briefs, this issue of whether a pre-loss oral agreement can bind an insurer requiring a written agreement finds little to no guidance in Texas jurisprudence.

requires a written agreement executed *before* an event for coverage occurs, is one which has also been embraced by several sister state courts. *See Cusumano v. Extell Rock, LLC*, 86 A.D.3d 448, 628–29 (N.Y. A.D. 1 Dept. 2011) (holding "Hard Rock was not entitled to additional insured status" where insurance policy provided coverage to additional insureds when "you have agreed, in writing, in a contract or agreement that another person or organization be added as an additional insured," and the construction agreement requiring additional insured coverage "was not signed at the time of the accident"); *Cincinnati Ins. Co. v. Gateway Const. Co., Inc.*, 865 N.E.2d 395, 399 (Ill. 2007) (holding where there was "no written agreement at the time of the accident, no other documentation confirming additional insured coverage at the time of the accident," and any written agreement stipulating to an additional insured coverage was not executed until after the accident, there was no coverage because the policy required that "All corporations, partnership[s] and or/[*sic*] affiliated individuals promised to be added as additional insured[s] under a written contract with the Named Insured."); *cf. LMIII Realty, LLC v. Gemini Ins. Co.*, 90 A.D.3d 1520, 1521 (N.Y.A.D. 4 Dept. 2011) (finding a written but unsigned purchase order, which included an additional insured endorsement, but was not signed until after a claim arose, was sufficient to obligate an insurer to add a third party as an additional insured to the policy); *see also Essex Ins. Co.*, 2012 WL 13009098, at *4–5 (interpreting a policy stating, *"*as an additional insured, any person or organization to whom you are obligated by valid written contract to provide such coverage but only as respects negligent acts or omissions," as requiring a "valid[,] written" contract *before* coverage of an event despite evidence that "the parties may have expressed their acceptance of certain material terms of the subcontractor agreement by their actions"). In

13

the aforementioned cases, as here, the policies did not plainly dictate that written agreements for additional insureds be executed prior to the event requiring coverage. However, the courts nonetheless held the policies required the insured and prospective additional insured to have entered into a written contract *prior* to an incident in order for additional insured status to attach.

In one particular case cited by FIE, an Indiana appellate court observed that though evidence established there was an oral agreement between an insured and potential additional insured, which was later reduced to writing, the court interpreted the insured's policy provision[6] as requiring "that the written agreement between the contracting parties . . . exist prior to commencement of work." *Liberty Ins. Corp. v. Ferguson Steel Co., Inc.*, 812 N.E.2d 228, 230–31 (Ind. Ct. App. 2004). The court's rationale was clear— a policy's requirement of a written contract would be rendered meaningless if we determined that the writing could occur post-reportable loss or that an oral promise occurring prior to the loss could suffice to bind an insurer. *See Cincinnati Ins. Co.*, 865 N.E.2d at 399; *Liberty Ins. Corp.*, 812 N.E.2d at 230–31 ("Liberty cannot insure a party without knowledge of the name of the party, the period of coverage, or of its obligation to do so."); *see also Cerestar USA, Inc. v. Safway Steel Products, Inc.*, No. 3:02-CV-123 RM, 2005 WL 8170921, at *8 (N.D. Ind. Jan. 3, 2005) (providing that an insurer "has a right to protect itself against responsibility for informal verbal agreements between contractors by requiring that agreements be in writing, and a holding to the contrary would

---

[6] The policy provision was quoted as follows:

> [A]ny person or organization for whom you are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy.

*Liberty Ins. Corp. v. Ferguson Steel Co., Inc.*, 812 N.E.2d 228, 229 (Ind. Ct. App. 2004).

14

allow for the creation of coverage by reducing oral agreements to writing after loss has occurred, in effect making coverage retroactive despite the terms of the policy") (internal quotations omitted); *see generally In re Deepwater Horizon*, 470 S.W.3d at 461 (analyzing an excess-insurance policy provision and determining that an "insurer's obligation depended on what it contracted to do, not what the insured contracted with another person to do"); *ATOFINA Petrochemicals, Inc. v. Cont'l Cas. Co.*, 185 S.W.3d 440, 443–44 (Tex. 2005) (holding an entity, Fina, was an additional insured at the time of the accident because there was nothing in the liability policy indicating that issuance of a certificate was a condition precedent to Fina's becoming an additional insured, the certificate was requested prior to the accident but issued after, and "[n]othing in the record indicates that Fina and A & B attempted to manufacture coverage after the accident").

USIC urges us to consider extrinsic evidence, such as the deposition testimony of Wasp and Cantu employees, when interpreting the policy. Because the policy language is unambiguous, such consideration would be inappropriate.[7] *See Nassar*, 508 S.W.3d at 258. Even if extrinsic evidence were necessary in order to determine the intent of the parties to the insurance contract, the deposition testimony refers only to what Cantu and Wasp intended regarding their respective obligations under the Cantu–Wasp contract. *See Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 479 (Tex. 2019); *In re Deepwater Horizon*, 470 S.W.3d at 461. The deposition testimony has no relevance as to what Wasp and FIE intended for their respective obligations to be under the FIE insurance contract. *See Westfield Ins. Co. v. FCL Builders, Inc.*, 948 N.E.2d 115, 120 (Ill.

---

[7] Having determined that the policy is unambiguous and requires that a written agreement be in place prior to a reported event, we need not consider a possible oral agreement in place prior to the event and whether Cantu is entitled to the reformation of said agreement.

App. 1 Dist., 2011)) (finding the consideration of deposition evidence and terms of a separate contract involving the insured business and a potential additional insured inappropriate when an appellate court is reviewing what an insurer and insured intended under the insurance policy contract); *U.S. Fid. & Guar. Co. v. Coastal Ref. & Mktg., Inc.*, 369 S.W.3d 559, 568 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (observing, in the context of excess insurance coverage, that the appellate court's analysis "does not depend on Coastal's intent regarding the effect of its agreement with Weaver" in which Weaver agreed to provide primary coverage to Coastal, because "[n]one of the insurers were parties to the agreement between Weaver and Coastal"); *see also Samsung Fire*, 2018 WL 310322, at *5 (providing that the question of "coverage (including a given policy's priority vis-à-vis other policies) is controlled by the insurance policy terms, not by the terms of the underlying trade contract").

Thus, this Court finds that the language of the additional insured provision of the FIE policy can only engender one reasonable meaning. That is, in order for Cantu to become an additional insured, Wasp and Cantu must have agreed via a written contract or agreement—and the written form must have occurred prior to the reported loss—which it did not. We conclude that FIE has conclusively established through its summary judgment motion and attached evidence that it was entitled to judgment as a matter of law. Accordingly, we overrule USIC's first issue on appeal and affirm the trial court's granting of FIE's motion for summary judgment.

### III.    WASP'S SUMMARY JUDGMENT

USIC, as the assignee and subrogee of Cantu, argues Wasp breached the subcontract with Cantu in its failure to defend or indemnify Cantu for claims asserted

16

against Cantu in the underlying suit with Martinez. Wasp counters that USIC's claim against it is barred by res judicata.

## A. Standard of Review and Applicable Law

Res judicata is an affirmative defense. TEX. R. CIV. P. 94. A defendant moving for summary judgment on an affirmative defense such as res judicata must conclusively prove the elements of that defense. *See Travelers Ins. Co. v. Joachim,* 315 S.W.3d 860, 862 (Tex. 2010). Specifically, it requires proof of the following elements: (1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action based on the same claims as were raised or could have been raised in the first action. *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 653 (Tex. 1996) (providing that the doctrine's purposes are to prevent a defendant from being "twice vexed for the same acts, and to achieve judicial economy by precluding those who have had a fair trial from relitigating claims").

There "at least three ways" in which to show privity between two parties: "(1) they can control an action even if they are not parties to it; (2) their interests can be represented by a party to the action; or (3) they can be successors in interest, deriving their claims through a party to the prior action." *Id.*; *see Getty Oil Co. v. Insurance Co. of N. Am.,* 845 S.W.2d 794, 800 (Tex. 1992) ("There is no general definition of privity that can be automatically applied in all res judicata cases; the circumstances of each case must be examined."); *see also Friedman v. Rozzlle*, No. 13-12-00779-CV, 2013 WL 6175318, at *6 (Tex. App.—Corpus Christi–Edinburg Nov. 21, 2013, pet. denied) (mem. op.). Essentially, privity exists "if the parties share an identity of interests in the basic legal right that is the subject of litigation," and "[t]o determine whether a prior and later lawsuit involve

17

the same basic subject matter, we focus on the factual basis of the complaint." *Amstadt*, 919 S.W.2d at 653 (citing *Barr v. Resolution Tr. Corp. ex rel. Sunbelt Fed. Sav.*, 837 S.W.2d 627, 630 (Tex. 1992); *see Samuel v. Fed. Home Loan Mortg. Corp.*, 434 S.W.3d 230, 234 (Tex. App.—Houston [1st Dist.] 2014, no pet.) ("The main concern is whether the cases share the same nucleus of operative facts.").

## B.    Discussion

Under the foregoing standards, we consider whether Wasp has conclusively established that res judicata bars USIC's suit.

On March 29, 2018, the trial court in the underlying suit granted Wasp's motion to dismiss Cantu's claims against it with prejudice. With respect to the first element, a dismissal with prejudice constitutes a final determination on the merits for res judicata purposes. *Harris Cty. v. Sykes,* 136 S.W.3d 635, 640 (Tex. 2004); *Better Bus. Bureau of Metro. Hous., Inc. v. John Moore Services, Inc.*, 500 S.W.3d 26, 40–41 (Tex. App.— Houston [1st Dist.] 2016, pet. denied). Moreover, to the third element, the subject of both the underlying case and the present case is FIE's liability policy with Wasp and, more specifically, whether Wasp owed a duty under that policy to defend and indemnify Cantu. The only substantive difference between the two cases is that USIC, rather than Cantu, is asserting Cantu's rights in the present case. *See Samuel*, 434 S.W.3d at 235–36; *Truck Ins. Exch. v. Mid-Continent Cas. Co.*, 320 S.W.3d 613, 618–19 (Tex. App.—Austin 2010, no pet.). Thus, our discussion focuses on the second element of whether privity exists. *See Amstadt*, 919 S.W.2d at 630.

USIC urges this Court to employ the analysis rendered by our sister court in *Equitable Recovery, L.P. v. Heath Ins. Brokers of Tex., L.P.* and find that the "dismissal

order has no effect on USIC's . . . right to bring its claims against Wasp" because there is no privity between the parties. 235 S.W.3d 376, 387 (Tex. App.—Dallas 2007, pet. dism'd) ("A party who does not own a claim is unable to release it."). We find this case to be distinguishable. In *Equitable*, the appeal turned on the "effect of a settlement of one of two sets of fraud-related claims involving two separate liability policies issued by the same insurer, [Caliber], to two different insureds," 22 Texas Services, L.P. and 22 Keystone Services, L.P. (22 Texas) and Senior Living Properties, L.L.C. (SLP). *Id.* at 379. Caliber sued 22 Texas and SLP alleging fraudulent inducement. *Id.* 22 Texas and SLP "blam[ed]" their wholesale insurance brokers, Heath Insurance Brokers of Texas, L.P., Heath Insurance Brokers, Inc., Heath Holdings USA, Inc., and HIB GP, Inc. (Heath) and Clair Odell Insurance Agency, L.L.C. (Odell), respectively. *Id.* at 380.

While SLP's suit was pending, it filed for bankruptcy, and Heath and Odell filed proofs of claim as creditors. *Id.* at 381. To resolve its pending state-court coverage disputes, SLP litigated them in a bankruptcy adversary proceeding; SLP sued Caliber (and others)[8] for contract breach and declaratory relief, and Caliber counterclaimed. *Id.* Caliber and SLP ultimately settled all their policy-related disputes. *Id.* The Caliber–SLP settlement "narrowly specified the claims it was assigning to be related to the SLP–Policy only, a defined term, never mentioning the [22 Texas claims]." *Id.* At that time, the 22 Texas claims were owned by 22 Texas, not Caliber, because Caliber had earlier settled with 22 Texas and assigned its claims against Heath to 22 Texas. *Id.* at 381–82.

22 Texas eventually assigned the claims to Equitable, which then brought a suit as assignee to recover what Caliber paid 22 Texas in the settlement. *Id.* In the case before

---

[8] 22 Texas were not parties to the adversary or bankruptcy proceedings. *Id.*

our sister court, Heath sought summary judgment on, in part, the affirmative defense of res judicata on Equitable claims, which the trial court granted. *Id.* at 379. The appellate court affirmed in part and reversed on Heath's affirmative defense. *Id.*

Heath argued on appeal that the bankruptcy court's dismissal of the Caliber-SLP claims "also extinguished Equitable [22 Texas claims] as a matter of law." *Id.* at 380. The appellate court disagreed, finding that "the [22 Texas claims] were not owned by any party to any transaction that Heath argues extinguished the [22 Texas claims] when those transactions were executed or occurred." *Id.* at 380. In fact, the party owning the claims were not involved in any capacity. *Id.* at 380–82.

These are materially different facts than those before this Court today. USIC's involvement throughout the underlying litigation is of import here. *See id.* USIC—though not named in the underlying lawsuit—acknowledges that it (1) was involved in the settlement negotiations and (2) at minimum,[9] was present when the trial court granted Wasp's motion to dismiss claims brought by Cantu against it. A relevant portion of the reporter's record from the underlying suit reads as follows:

> THE COURT: C-7318-14-H; Hector Guadalupe vs. WASP, LLC. Let's go.
>
> MR. QUEZADA: Jesse Quezada here on behalf of the defendant, WASP Construction, Your Honor. I filed a Motion to Dismiss the claims against my client by Cantu Construction. There's a Rule 11 that was entered into by Counsel for—I'm going to tender Exhibit Number 1. It's a Rule 11 agreement as between the parties, it settled all the claims. Apparently, there's litigation going on in Judge Rose Reyna's court between the insurance company that funded the settlement in this case and apparently they're taking the position that they'd rather wait on the dismissal of this case until

---

[9] USIC argues on appeal that its counsel did not "acquiesce[] to the entry of the dismissal order."

20

other issues are resolved in Judge Rose Reyna's court. Our position is we want the case dismissed.

THE COURT:        Okay. This had to do with which defendant?

MR. QUEZADA:      Defendant Cantu Construction.

THE COURT:        No, I understand, but who was objecting.

MRS. ELIZONDO:    Cantu Construction. Liliana Elizondo on behalf of Alonzo Cantu Construction.

MRS. GREEN:       And Mary Green, Your Honor on behalf of United Specialty, the insurer for Cantu.

MRS. ELIZONDO:    Cantu Construction has assigned its claims to its carrier. The settlement was entered into. That Rule 11 was entered into at the same time that an agreement was made between the carriers for WASP and Cantu to also settle their claims or resolve them in a specific way. And that's why Mrs. Green is here, so she can represent things to the Court about that, but since that is ongoing in the other court, we feel that any dismissal of these claims—

THE COURT:        My case is done. I don't understand why I should keep it on my books.

MRS. GREEN:       Your Honor—

THE COURT:        My case is settled.

MRS. GREEN:       Yes, Your Honor.

THE COURT:        Do you have any case law, anything that says I should keep it on the books?

MRS. GREEN:       No, Your Honor.

THE COURT:        Okay. We're done. It's dismissed.

. . . .

THE COURT:        The Court is also signing the Order Granting Defendant/Cross Defendant WASP Construction, LLC Motion to Dismiss with prejudice.

21

MR. QUEZADA:    Thank you, Your Honor.

THE COURT:    And I'll ask you again, do you have anything to show me why I shouldn't do that?

MRS. GREEN:    No, Your Honor.

THE COURT:    Okay. It's signed. Thank you.

Several months prior, on the same day FIE and USIC confirmed agreement to payout a settlement in the underlying suit on behalf of Wasp and Cantu: (1) Cantu assigned its claims against Wasp to USIC, *and* (2) Cantu's counsel executed a letter signed by counsel for Cantu, Wasp, and the plaintiffs, confirming the agreement reached—which included the settlement of its claims against Wasp:

> [Plaintiffs] have agreed to settle all claims against [Cantu] [as] well as all claims against [Wasp], in the above referenced matter in exchange for two million dollars ($2,000,000.00). Further, this letter shall serve as confirmation that [Cantu] has agreed to settle all cross-claims against [Wasp] in the above reference matter.

The language used in Cantu's email to Wasp would indicate that it had the authority to settle its claims, and USIC has not elucidated which occurred first—the assignment or Wasp's agreement to settle claims—in either its brief or when questioned during oral argument. Although there was brief mention of the assignment at the dismissal hearing, the record does not indicate whether Cantu amended its pleadings in the underlying suit to reflect the assignment, and the order granting Wasp's motion to dismiss with prejudice appears to have taken into consideration the pleadings on file in the court.

In any matter, exhibits before the trial court at bar demonstrate that USIC had "control [of the] action even if they [were] not parties to it," had "interests . . . represented by a party to the action," and now "deriv[e] their claims through a party to the prior action."

22

*Amstadt*, 919 S.W.2d at 653. This is what is needed to prove privity, and USIC cannot now, where it previously exerted its presence, benefit from an unnamed party status in the underlying suit. *See id.*; *see also Porterfield v. Cenlar FSB*, No. 05-14-00663-CV, 2016 WL 1019359, at *6 (Tex. App.—Dallas Mar. 15, 2016, no pet.) (mem. op.); *cf. Benson v. Wanda Petroleum Co.*, 468 S.W.2d 361, 364 (Tex. 1971) (holding no res judicata where "the plaintiff in the later suit was neither a party to the former action nor in privity with any party in the sense that his rights were derived from one who was a party; and the cause of action always had been that of the present plaintiff who had no voice in the conduct of the prior suit, with no right to examine witnesses or to take other action to protect his interests"); *Equitable Recovery*, 235 S.W.3d at 384–85; *see generally C.I.R. v. Sunnen*, 333 U.S. 591, 597 (1948) ("[Res judicata] rests upon considerations of economy of judicial time and public policy favoring the establishment of certainty in legal relations.").

For the foregoing reasons, we conclude that Wasp has conclusively established through its summary judgment motion and attached evidence that it was entitled to judgment as a matter of law on the basis of res judicata. Accordingly, we overrule USIC's second issue and affirm the judgment of the trial court granting Wasp's motion for summary judgment.

## IV.   CONCLUSION

We affirm the trial court's judgments.

GREGORY T. PERKES
Justice

Delivered and filed the
29th day of October, 2020.

23